UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

QUINCY ARCHER,

Plaintiff,

-against-

WOLFF SHOE COMPANY, d/b/a MARMI SHOES,

Defendant.

Civil Action No. 11-cv-1737

Johnson, J.
Pohorelsky, M.J.

**DEFENDANT'S STATEMENT OF UNCONTESTED FACTS PURSUANT TO RULE 56.1 OF THE LOCAL CIVIL RULES OF THE U.S. DISTRICT COURTS FOR THE SOUTHERN AND EASTERN DISTRICTS OF NEW YORK**

JACKSON LEWIS LLP
*ATTORNEYS FOR DEFENDANTS*
666 Third Avenue, 29th Floor
New York, New York 10017
(212)545-4000

*Attorneys of Record:*
Wendy J. Mellk, Esq.
Kimberly N. Dobson, Esq.

Defendant, by its attorneys, Jackson Lewis LLP, submits the following Statement of Uncontested Facts in Support of Defendant's Motion for Partial Summary Judgment pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York.

## I. BACKGROUND.[1]

### A. Overview of Defendant Wolff Shoe Company d/b/a Marmi Shoes.

1. Defendant Wolff Shoe Company is the parent company of Marmi Shoes. (Oriakhi Dep. 21).[2] Defendant is a national shoe manufacturer and distributer which owns and operates retail shoe stores (under the name of Marmi Shoes), including a store located at 519 Madison Avenue, New York, New York (hereinafter referred to as the "Madison Avenue Store"). (Complaint ¶ 5; Alper Dep 18).[3]

2. At all times relevant to the allegations in Plaintiff's Complaint, Risa Alper held the position of Director of Operations and Buyer for Defendant. (Alper Dep. 22).

3. At all times relevant to the allegations in Plaintiff's Complaint, Jane (Oriakhi) Harris was the Store Manager of the Madison Avenue Store. (Oriakhi Dep. 54-55; Complaint ¶ 16).[4] As Store Manager, Ms. Oriakhi was responsible for hiring, firing and

---

[1] Defendant accepts as true Plaintiff's allegations solely for purposes of this Motion and reserves the right to controvert such allegations in any further proceeding in this matter.

[2] References to "Oriakhi Dep." refer to copies of cited pages from the transcript of the deposition of Jane Oriakhi (Harris), conducted on April 3, 2012 and attached to the Affirmation of Wendy J. Mellk ("Mellk Affirmation") as Exhibit B.

[3] "Complaint ¶ ___" refers to the Plaintiff's Complaint in the instant matter, attached to the Mellk Affirmation as Exhibit A. References to "Alper Dep. ___" refer to the copies of cited pages from the transcript of the deposition of Risa Alper, conducted on March 22, 2012 and attached to the Mellk Affirmation as Exhibit C.

[4] Jane Harris was formerly known as Jane Oriakhi (her maiden name) during Plaintiff's employment with Defendant. (Alper Dep. 29). She is referred to as "Jane Oriakhi" in the Complaint, subsequent pleadings and discovery items. To avoid any confusion, Defendant will refer to Ms. Harris as "Ms Oriakhi."

disciplining the Madison Avenue Store employees. (Pl. Dep. 227; Oriakhi Dep. 110-11; Alper Dep. 61, 65-66).[5]

4. For most of the relevant time period, Ms. Oriakhi reported to Ms. Alper. (Oriakhi Dep. 112).

5. Ms. Oriakhi is a Black female who was born in Nigeria, Africa. (Pl. Dep. 188, 243; Oriakhi Dep. 16). She came to the United States in or around 1996. (Oriakhi Dep. 17).

6. Ms. Oriakhi was employed by Defendant for approximately thirteen (13) years, until she voluntarily left in 2011. (Oriakhi Dep. 14; Alper Dep. 31).

7. Defendant is an equal opportunity employer which maintains policies prohibiting harassment and discrimination in the workplace and a bona fide complaint procedure. (Oriakhi Dep. 47-49, 55-57; Alper Dep. 100, 105-06, 109; D000102-103).[6] Its policies also prohibit retaliation against employees who complain about harassment or discrimination. (Oriakhi Dep. 59-60; Alper Dep. 100, 102, 280; D000102-103). It was Ms. Oriakhi's practice to review Defendant's anti-harassment and discrimination policies with all new employees at the start of employment. (Oriakhi Dep. 48-49).

**B. <u>Overview of Plaintiff's Employment with Defendant.</u>**

8. Plaintiff Quincy Archer is a Black male who was born in Guyana. (Pl. Dep. 84). Plaintiff came to the United States when he was 14 years old and is a citizen of the United States. (Complaint ¶ 11; Pl. Dep. 72).

---

[5] References to "Pl. Dep. __" refer to copies of cited pages from the transcript of the deposition of Plaintiff Quincy Archer, conducted on December 8, 2011 and attached to the Mellk Affirmation as Exhibit D.

[6] Copies of referenced documents produced by Defendant during the course of discovery are attached to the Mellk Affirmation as Exhibit E.

**1. Plaintiff Was Hired As a Stock Associate in March 2007.**

9. In or around late February 2007, Ms. Oriakhi interviewed Plaintiff. (Complaint ¶ 13). Joining Ms. Oriakhi in interviewing Plaintiff was Sultan Khalil. (Pl. Dep. 145; Oriakhi Dep. 71). Mr. Khalil was, at that time, an Assistant Manager in Madison Avenue Store, reporting to Ms. Oriakhi. (Pl. Dep. 151; Oriakhi Dep. 71).

10. A friend of Ms. Oriakhi's (Abisola Awokere), who worked at a retail establishment unrelated to Defendant and who had referred other potential candidates to Ms. Oriakhi in the past, suggested to Plaintiff that he reach out to Ms. Oriakhi to see if she had any available sales positions. (Pl. Dep. 126-27; Oriakhi Dep. 66-67). Ms. Awokere did not know Plaintiff personally, but, rather, had met him while he was working at Club Monaco (a clothing retail store).[7] (Pl. Dep. 126-27).

11. Despite the fact that the Madison Avenue Store did not have available sales positions at that time, Ms. Oriakhi agreed to interview Plaintiff because (1) of the referral by Ms. Awokere; and, (2) Ms. Oriakhi liked to have potential candidates "in the pipeline" due to the nature of the retail business. (Pl. Dep. 126-27, 149; Oriakhi Dep. 66-67, 83, 103).

[7] At deposition, Plaintiff testified that he left Club Monaco (where he claimed that he was the lead salesperson) voluntarily. (Pl. Dep. 141). However, the documents subpoenaed from Club Monaco with regard to Plaintiff's employment indicate that Plaintiff was discharged for cause (unacceptable tardiness) and was not eligible for rehire. See Exhibit F to the Mellk Affirmation.

12. Ms. Oriakhi was not impressed by Plaintiff during his interview.[8] (Oriakhi Dep. 96). Among other things, he was late for the interview and did not appear to her to show any genuine enthusiasm for selling shoes. (Pl. Dep. 143; Oriakhi Dep. 79, 91-92). Further, she was dissatisfied with the reasons Plaintiff gave for leaving Club Monaco. (Oriakhi Dep. 96).[9]

13. Plaintiff was not offered a position at the conclusion of the interview. (Pl. Dep. 148-49).

14. Although the Madison Avenue Store did not have any available sales positions, the Store was in desperate need for help in the stock room. (Oriakhi Dep. 107-08). Accordingly, approximately one week after Plaintiff's interview, Ms. Oriakhi decided to offer Plaintiff a stock person position. (Pl. Dep. 150; Oriakhi Dep. 107). Ms. Khalil concurred with her decision. (Oriakhi Dep. 107-08).

15. Plaintiff accepted and commenced employment with Defendant in or around March 2007 as a stock associate in Defendant's Madison Avenue store. (Complaint ¶ 15; Oriakhi Dep. 129).

16. Plaintiff's employment at Defendant was "at will." (Pl. Dep. 225-26). Plaintiff understood that he was not employed subject to any contract or agreement that guaranteed his employment for any duration of time. (Pl. Dep. 225-26).

---

[8] At or around the time of his interview, Plaintiff completed and signed an employment application, acknowledging that the "information provided by me in this application for employment is true and complete to the best of my knowledge". On the application he checked the line next to college degree, wrote "NYU" as the name of the college he attended and also wrote "English literature" on the blank line next to the inquiry regarding type of "Degree". (Pl. Dep. Exhibit C). Copies of documents referenced from Plaintiff's deposition are attached to the Mellk Affirmation as Exhibit G). At deposition, Plaintiff admitted that the information he gave Defendant was untrue as he never attended NYU (or any other college or university) and does not have a college degree. (Pl. Dep. 156-57). Plaintiff's explanation for the falsification was that he "was planning on attending NYU". (Pl. Dep. 156-57).

[9] Ms. Oriakhi recalls that Plaintiff told her and Mr. Khalil that he was leaving Club Monaco because he was not "getting hours" due to his rejection of his female supervisor's advances. (Oriakhi Dep.81-82).

17. Plaintiff's job duties as stock associate included, *inter alia*, maintenance of, and assistance in, the stockroom; cleanliness of the stock room; shipping and receiving; working his scheduled hours and clocking in and out for each scheduled shift; processing special orders; maintaining the stockroom walls in alphabetical order by size; and, ensuring that all shoes were properly tissued. (Pl. Dep. 182-83; Oriakhi Dep. 188). Plaintiff worked between 38 to 39 hours per week (Pl. Dep. 216). He reported directly to Ms. Oriakhi, who made all decisions concerning his employment. (Complaint ¶ 16, 37).

**2. Plaintiff Received A Less Than Satisfactory 90 Day Performance Review**

18. On or about July 23, 2007, Ms. Oriakhi gave Plaintiff a 90-day performance review, which included an improvement plan. (Pl. Dep. 219-20; Oriakhi 143; Pl. Dep. Exhibit I). The 90-day performance review and improvement plan noted, *inter alia*, that Plaintiff's attendance and punctuality were "below expectations" and required improvement; and, that he needed to improve in the areas of following instructions from senior management, taking initiative in the stockroom and completing assigned tasks. (Pl. Dep. 222; Pl. Dep. Exhibit I).

19. Ms. Oriakhi also noted on the improvement plan that Plaintiff needed to improve his appearance. Ms. Oriakhi had spoken with Plaintiff about not coming to work with a dirty shirt. (Oriakhi Dep. 278-79). On at least one occasion, Ms. Oriakhi spoke with Plaintiff about the need to address a personal hygiene/body odor issue. (Oriakhi Dep. 279).

20. In an attempt to motivate Plaintiff to improve his performance, Ms. Oriakhi noted on the performance improvement plan that "Quincy has a lot of potential at Marmi

and I want him to grow and do the job that we have trained him to do." (Pl. Dep. 227; Pl. Dep. Exhibit I).

21. Plaintiff acknowledged his receipt and review of both the 90-day performance review and improvement plan by signing each document (Pl. Dep. 220, 227; Pl. Dep. Exhibit I). Plaintiff did not write any comment on the performance review or improvement plan, even though the performance review allowed space for employee comments. (Pl. Dep. 220, 227; Pl. Dep. Exhibit I).

22. In a Stock Associate Self-Evaluation Plaintiff completed in December 2007, Plaintiff rated himself as "fair" in the area of punctuality, acknowledged that he still needed to improve in this area, and commented that that "I can be more punctual in terms of getting to work on time". (Pl. Dep. Exhibit J; Pl. Dep. 229).

### 3. Ms. Oriakhi Reprimanded Plaintiff and A Co-Worker For The Use of Inappropriate Language In The Workplace.

23. On or about January 4, 2008, Ms. Oriakhi overheard Plaintiff and a co-worker each use the word "Nigger" (hereafter referred to as the "N" word) during what appeared to Ms. Oriakhi to be an amicable conversation in which they were engaged. (Oriakhi Dep. 251-53). Because Ms. Oriakhi found the use of the "N" word to be extremely inappropriate, she issued a written disciplinary warning to both Plaintiff and the co-worker (Ellis Fernandez) for this conduct. (Pl. Dep. 232; Pl. Dep. Exhibit K; Oriakhi Dep. 261-62; Exhibit H to the Mellk Affirmation). Although Plaintiff testified at deposition that he did not use the "N" word (Pl. Dep. 233), Plaintiff signed the disciplinary warning and did not make any written comment on or about the warning. (Pl. Dep. 234-35; Oriakhi Dep. 263).

**4. Plaintiff's Employment With Defendant Ended In July 2008.**

24. On July 14, 2008, Plaintiff called the Madison Avenue store to advise Ms. Oriakhi that a cousin of his grandmother who lived in Guyana had died, and that he would be arriving to work late. (Pl. Dep. 286, 289; Complaint ¶ 35). In response, Ms. Oriakhi told Plaintiff that he should take the day off from work. (Pl. Dep. 286). Plaintiff declined to take time off, insisted that he would come into work that day and said that he would arrive by 1:00 p.m. (Pl. Dep. 286).

25. Plaintiff did not arrive to work until after 1:00 p.m. (Pl. Dep. 287; Complaint ¶ 36). After Plaintiff arrived, Ms. Oriakhi asked him why he had not called if he was going to be late, as his lateness affected the ability of his co-workers to take their lunch break. (Oriakhi Dep. 371-72). In response to Ms. Oriakhi's inquiry, Plaintiff became visibly upset/angry, prompting Ms. Oriakhi to tell him that he should go home. (Oriakhi Dep. 379-40). Plaintiff admits that he told Ms. Oriakhi that if he went home, he would not return to work. (Pl. Dep. 288). Plaintiff left work that day, which was Plaintiff's last day working for Defendant. (Pl. Dep. 280, 286).

26. Plaintiff claims that during this conversation, Ms. Oriakhi told him he was "fired". (Pl. Dep. 290). Ms. Oriakhi denies this allegation. She testified at deposition that she told Plaintiff to go home, clear his head and return at his next scheduled shift. (Oriakhi Dep. 380-81). He responded that if he went home, he would not return. (Oriakhi Dep. 380-81). Ms. Oriakhi recalls saying to Plaintiff "I'm taking it that you are quitting" to which Plaintiff responded "yes". (Oriakhi Dep. 379; Oriakhi Dep. Exhibit 10).

## II. APPROXIMATELY ONE MONTH AFTER LEAVING DEFENDANT'S EMPLOY, PLAINTIFF FILED AN ADMINISTRATIVE CHARGE OF DISCRIMINATION WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC") CLAIMING RACE, NATIONAL ORIGIN AND DISABILITY DISCRIMINATION, BUT NOT SEXUAL HARASSMENT.

27. On or about August 26, 2008, Plaintiff filed a charge of discrimination with the EEOC. (Complaint ¶ 6; P012[10]). In Plaintiff's August 26, 2008 Charge, he alleges he was discriminated against on the basis of race (Black), color, national origin (Guyanese) and alleged disability (keloids). (Pl. Dep. 292; P012). As his Charge makes clear, and Plaintiff admitted during his deposition, Plaintiff did not include any allegations of sexual harassment or harassment based on his gender in his EEOC Charge. (Pl. Dep. 294).

28. On or about December 17, 2008, Plaintiff amended his EEOC Charge alleging that Defendant retaliated against him by opposing his request for unemployment insurance benefits. (P015). For the basis of the retaliation, Plaintiff checked "race" only. (P015). Plaintiff did not include any allegations of sexual harassment or hostile work environment based on his gender in that amended EEOC Charge. (P015).

29. Plaintiff also never alleged in either EEOC Charge that he had complained to Defendant about alleged discrimination (on any ground) or that Defendant had retaliated against for any such complaints. (P012, P015).

30. Plaintiff received unemployment insurance benefits after leaving Defendant's employ. (Pl. Dep. 345).

[10] Copies of documents produced by Plaintiff during discovery are attached to the Mellk Affirmation as Exhibit I.

## III. PLAINTIFF COMMENCED THE INSTANT LAWSUIT AGAINST DEFENDANT IN APRIL 2011 AND ASSERTED, FOR THE FIRST TIME, A TIME-BARRED CLAIM OF SEXUAL HARASSMENT.

31. After receiving a Notice of Right to Sue from the EEOC, Plaintiff filed the Summons and Complaint in this matter on or about April 8, 2011. (Complaint ¶8). In addition to alleging claims of race, national origin and disability discrimination under Section 1981, Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State and City Human Rights Laws (collectively "HRL"), Plaintiff also asserted, for the very first time, a complaint under the HRL that Ms. Oriakhi sexually harassed him. (Complaint ¶¶ 62-66 and 71-75). He also asserted, for the first time, that he had complained about alleged harassment and discrimination and had been retaliated against for such alleged complaints. (Complaint ¶¶ 62-66 and 71-75).

32. Plaintiff's claim of sexual harassment is premised on his allegation that Ms. Oriakhi made sexual comments and advances towards him solely during his first few weeks of employment with Defendant *i.e.*, March – April 2007—four years before filing the instant Complaint. (Pl. Dep. 257-58). Specifically, Plaintiff alleges that during this limited time period, Ms. Oriakhi made comments about Plaintiff's physical appearance; asked him out on dates; suggested he could advance with Defendant if he had an intimate relationship with her; and, grabbed Plaintiff's crotch. (Pl. Dep. 253-54). Ms. Oriakhi denies making any sexually inappropriate comments or advances towards Plaintiff. (Oriakhi Dep. 244-46).

33. Plaintiff claims that after he rejected Ms. Oriakhi's advances and complained about her, she and Mr. Khalil began to retaliate against Plaintiff by discriminating against him on the basis of his race, national origin and alleged disability by failing to promote him into a sales position, unfairly disciplining him, purportedly exposing him to lead paint and discharging him. (Complaint ¶¶ 19-39).

34. In addition to the claim of sexual harassment, Plaintiff includes the following allegations in his Complaint: (1) Defendant failed to promote him to sales person because of his race, national origin and purported disability; (2) he was subjected to disparate treatment in the terms and conditions of his employment and harassed because of his race, national origin and purported disability; (3) he was discharged because of his race, national origin and purported disability; and, (4) Defendant retaliated against Plaintiff (a) for rejecting Ms. Oriakhi's alleged sexual advances; (b) for lodging alleged complaints to Defendant's management about harassment and discrimination; (c) by failing to promote him to sales person; (d) by discriminating against him in the terms and conditions of his employment; (e) by harassing him, and, (f) by terminating his employment. (Complaint ¶¶ 40-81).

## IV. THERE IS NO EVIDENCE THAT PLAINTIFF WAS DISCRIMINATED AGAINST ON THE BASIS OF HIS NATIONAL ORIGIN.

35. At deposition, Plaintiff testified that his claim of national origin discrimination was based upon three comments Ms. Oriakhi purportedly made: (1) telling Plaintiff that he smelled; (2) stating that Plaintiff was from the ghetto; and, (3) stating that he could not be understood when he spoke. (Pl. Dep. 239-40). According to Plaintiff, these alleged comments were made after, and because, Plaintiff allegedly rejected Ms. Oriakhi's alleged sexual advances and then complained about same. (Complaint ¶ 24).

36. Plaintiff testified that Ms. Oriakhi called his clothing "dirty" and stated that he "was always smelling." (Pl. Dep. 240-41). As set forth above, Ms. Oriakhi testified that there was only one incident where Plaintiff's shirt was dirty at work and she felt it was giving off an odor. (Oriakhi Dep. 279).

37. Ms. Oriakhi testified that she did not notice that Plaintiff spoke with an accent because she herself, being from Nigeria, had an accent. (Oriakhi Dep. 91). Further,

during Plaintiff's employment, Ms. Oriakhi was unaware that Plaintiff was born in Guyana. (Oriakhi Dep. 90).

38. Plaintiff does not claim that Ms. Oriakhi made any comments specifically directed or related towards his birthplace of Guyana (*i.e.*, his national origin). (Pl. Dep. 240). Ms. Oriakhi's husband is of Guyanese descent. (P020).

39. Plaintiff does not claim that any comment regarding his national origin was made at or around the time his employment with Defendant ended. (Complaint ¶ 24, 34-37; Pl. Dep. 239-43).

## V. PLAINTIFF CANNOT ESTABLISH THAT HE WAS NOT PROMOTED TO A SALES ASSOCIATE POSITION BECAUSE OF HIS RACE, NATIONAL ORIGIN OR PURPORTED DISABILITY.

40. Plaintiff testified that when he met Ms. Oriakhi for the first time in or around late February 2007, he had visible keloids (an overgrowth of scar tissue) on his earlobes. (Pl. Dep. 167; Complaint ¶ 10). Plaintiff developed keloids on his earlobes after he pierced his ears. (Bacchus Dep. 103[11]).

41. Plaintiff testified at deposition that the first time he met Ms. Oriakhi, she told him he was "attractive" and that she "liked him a lot" (Pl. Dep. 133, 147 ); Ms. Oriakhi was nice to him when they first met (Pl. Dep 135); when he first met Mr. Khalil, Mr. Khalil told him he was "impressive"; and, when Ms. Oriakhi offered him the stock associate position, she told him "you're going to get a sales position as soon as one opens" and "mentioned that [Plaintiff was] going to be an assistant manager within six months". (Pl. Dep. 150).[12]

---

[11] References to "Bacchus Dep." refer to copies of the cited pages from the transcript of the deposition of Patricia Bacchus, conducted on April 10, 2012 and attached to the Mellk Affirmation as Exhibit J.

[12] Ms. Oriakhi and Mr. Khalil both deny all of these allegations. (Oriakhi Dep. 70-99).

42. Plaintiff had no management experience before becoming employed at Defendant. (Pl. Dep. Exhibit A; Pl. Dep. 116).

43. Plaintiff's keloids did not grow significantly in size from February 2007 until May 2007, when he voluntarily had the keloids removed. (Pl. Dep. 171, 175). On at least one occasion prior to May 2007, Plaintiff had the keloids removed. (Pl. Dep. 171).

44. Ms. Oriakhi testified at deposition that she did not notice any keloids on Plaintiff's ears until *Plaintiff* pointed them out to her when he advised her he would be having surgery to have the keloids removed in May 2007. (Oriakhi Dep. 300).

45. Ms. Alper did not notice any keloids on Plaintiff's ears. (Alper Dep. 127-29).

46. Plaintiff admits that the keloids do not affect his ability to work or care for himself. (Pl. Dep. 245, 247). Further, the keloids do not impair Plaintiff's ability to speak, talk, hear or breathe. (Pl. Dep. 245).

47. Plaintiff claims that Ms. Oriakhi started to "make fun" of his keloids after he complained about sexual harassment. (Complaint ¶ 24; Pl. Dep. 244).

48. Plaintiff claims that Ms. Oriakhi still failed to promote him after the keloids were removed, and told him that he could not be a sales associate because he had a visible tattoo. (Pl. Dep. 241). Defendant's policies prohibit sales associates from having visible tattoos on the sales floor. (Oriakhi Dep. 83-85; 102). Plantiff used make-up to cover the tattoo (which visibly is located on his neck and is visible with a regular collared shirt), to which Ms. Oriakhi reacted positively. (Pl. Dep. 167-68, 170; Oriakhi Dep. 315).

49. Ms. Oriakhi testified that she did not promote Plaintiff into a sales position because she did not believe that his performance as a stock associate warranted a promotion.

(Oriakhi Dep.150-52, 304-05). She believed he was inconsistent in his performance as a stock associate and had punctuality issues from time to time. (Oriakhi Dep. 151-52, 328, 330, 344-45). Ms. Oriakhi recalls telling Plaintiff that if he could stay consistent in his stock associate performance, she would consider promoting him to a sales associate. (Oriakhi Dep. 304-05).

50. During the course of Plaintiff's employment and subsequent thereto, Ms. Oriakhi hired and employed at least thirteen (13) Black sales associates. (Pl. Dep. 11, 18, 23, 41, 213; Alper Dep. 176-78, 180-81; Khalil Dep. 114-15; Oriakhi Dep. 298; D000855).[13]

51. Indeed, of the thirty-four (34) employees employed as sales associates between March 2007 and October 2011, at least thirteen (13) are Black. The remainder are a diverse mix of other races and national origins, including Middle Eastern, Hispanic and Caucasian. (D000855; Pl. Dep. 11, 18, 23, 41, 213; Alper Dep. 176-78, 180-81; Khalil Dep. 114-15; Oriakhi Dep. 298).

## VI. PLAINTIFF CANNOT ESTABLISH THAT HE WAS SUBJECTED TO DISPARATE TREATMENT DISCRIMINATION ON THE BASIS OF HIS RACE/COLOR, NATIONAL ORIGIN, ALLEGED DISABILITY (OR ANY OTHER PROTECTED CATEGORY).

52. Plaintiff alleges that he was subjected to disparate working conditions, unfairly disciplined, accused of theft, directed to scrape paint which contained lead and discharged on the basis of his race, national origin and alleged disability. (Complaint ¶¶ 40-81).

53. Plaintiff was not disciplined for any conduct other than the reprimand that he and a Hispanic co-worker (Ellis Fernandez) received for the use of the "N" word. (Pl. Dep. 233-34; Complaint ¶ 27; Oriakhi Dep. 261-63).

[13] References to "Khalil Dep. ___" refer to copies of cited pages from the transcript of the deposition of Sultan Khalil, conducted on February 15, 2012 and attached to the Mellk Affirmation as Exhibit K.

54. Plaintiff never was disciplined for theft. (Complaint ¶ 28; Pl. Dep. 353-355). At some point during Plaintiff's employment, several empty shoe boxes (representing over a thousand dollars of shoes that remained on the store's inventory) were discovered hidden away on the upper floors of the Store. (Oriakhi Dep. 282; Pl. Dep. 353-55). An investigation was commenced and all Madison Store employees were interviewed separately, including a brief interview of Plaintiff. (Oriakhi Dep. 281-87; Pl. Dep. 353-55). Defendant did not take any other action with respect to the alleged theft. (Pl. Dep. 353-55; Oriakhi Dep. 287). Defendant never discovered what happened to the missing shoes. (Oriakhi Dep. 287).

55. In June 2008, Plaintiff assisted with the painting of a portion of a wall/ceiling on an upper floor of the Madison Avenue Store. (Complaint ¶ 32; Pl. Dep. 269-71; Oriakhi Dep. 214). Prior to Plaintiff commencing this task, Ms. Oriakhi had spent more than an hour scraping the old paint off of the ceiling. (Oriakhi Dep.202). Other employees, including other management employees, have assisted in the past with painting various parts of the Store. (Oriakhi Dep. 222, 228).

56. Plaintiff spent approximately one hour on the painting project before he was called to assist with his stock duties, as the store was busy that day. (Oriakhi Dep. 216).

57. After Plaintiff left Defendant's employ, Ms. Oriakhi learned that the paint she and Plaintiff both scraped contained lead. (Oriakhi Dep. 208-10, 220-24). Before that time, Ms. Oriakhi was unaware that the paint contained lead. (Oriakhi Dep. 208-10, 220-24). If she had been aware, she would not have allowed Plaintiff (or herself) to engage in the painting project. (Oriakhi Dep. 208-10, 220-24).

58. Plaintiff felt he was treated worse than all other employees during his employment with Defendant. (Pl. Interrogatory No. 4).[14] Plaintiff alleges that all employees who worked with Plaintiff received preferential treatment over him. (Pl. Interrogatory No. 4).

59. Plaintiff testified that his race claim was based upon purportedly discriminatory comments made to him during the course of his employment, which he believes were prompted by his alleged rejection of Ms. Oriakhi's advances and his alleged complaints thereabout. (Pl. Dep. 189-190).

60. Plaintiff alleges he was called "another black statistic" by Ms. Oriakhi and he was called the "N word" on more than one occasion by Ms. Oriakhi, Mr. Khalil and Tracey Barber (a Caucasian assistant manager). (Pl. Dep. 189-90). He testified that these comments were the sole basis for his race discrimination claim. (Pl. Dep. 190).

61. Plaintiff alleges that Ms. Oriakhi called him "another black statistic" in connection with the birth of his child and purportedly told him that she was happy for Plaintiff but not happy for the child. (Pl. Dep. 190-91). Ms. Oriakhi denies making this statement and expressed congratulatory words to Plaintiff on the birth of his child. (Oriakhi Dep. 248-49).

62. Although Plaintiff claims that Mr. Khalil used the "N-word" when speaking to Plaintiff on numerous occasions throughout Plaintiff's tenure with Defendant, Plaintiff confirmed that he never heard Mr. Khalil use that term when speaking to any other black employee. (Pl. Dep. 205). Plaintiff claims Mr. Khalil used the "N" word in the context of "he would come in and say 'hey N, what's going on N, get this N, did you do this N'". (Pl. Dep. 208-09). Mr. Khalil denies using the "N-Word". (Khalil Dep. 89).

---

[14] Plaintiff's Interrogatory responses are attached to the Mellk Affirmaiton as Exhibit L.

63. Ms. Oriakhi never heard Mr. Khalil use the "N-word" during his tenure at Defendant. (Oriakhi Dep, 249).

64. Plaintiff confirmed that he never heard Ms. Oriahki use the "N word" when speaking to anyone else. (Pl. Dep. 207). Ms. Oriakhi denies using the "N-Word". (Oriakhi Dep. 61). The only time Ms. Oriakhi heard the "N-Word" uttered in the workplace, was during a conversation between *Plaintiff* and another employee. (Oriakhi Dep. 249-250).

65. The first time Plaintiff alleges Ms. Oriakhi and Mr. Khalil alleged used the "N" word with Plaintiff was after he allegedly complained about alleged sexual harassment. (Pl. Dep. 202-03).

66. Although Plaintiff well was aware that he could leave his employment with Defendant at any time if he was unhappy with his position or how he was being treated, Plaintiff remained employed by Defendant. (Pl. Dep. 176). Not only did Plaintiff continue to work for Defendant, he also continued to seek a sales position at the Madison Avenue Store. (Pl. Dep. 210).

67. Plaintiff does not complain that any racial epithet or derogatory term concerning his race, national origin or alleged disability was made in connection with the cessation of his employment. (Complaint ¶ 35-37).

Based on the foregoing facts and for the reasons to be set forth in Defendant's Memorandum of Law in Support of its Motion for Partial Summary Judgment, the relief requested should be granted in its entirety.

Dated: New York, New York
May 31, 2012

Respectfully submitted,

JACKSON LEWIS LLP
*ATTORNEYS FOR DEFENDANTS*
666 Third Avenue, 29th Floor
New York, New York 10017
(212)545-4000

By: Wendy J Mellk (KN)
WENDY J. MELLK, ESQ.
KIMBERLY N. DOBSON, ESQ.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of May, 2012, DEFENDANT'S STATEMENT OF UNCONTESTED FACTS PURSUANT TO RULE 56.1 OF THE LOCAL CIVIL RULES OF THE U.S. DISTRICT COURTS FOR THE SOUTHERN AND EASTERN DISTRICTS OF NEW YORK, was served in accordance with the Federal Rules of Civil Procedure, the Eastern District's Local Rules, and the Eastern District's Rules on Electronic Service, and by serving a copy of said document via electronic mail upon the following parties:

Kenneth P. Thompson, Esq.
Paul A. Clarke, Esq.
Shaffin A. Datoo, Esq.
THOMPSON WIGDOR & GILLY LLP
*Attorneys For Plaintiff*
85 Fifth Avenue
New York, New York 10003
(212) 257-6800

Kimberly N. Dobson
KIMBERLY N. DOBSON, ESQ.

4824-7745-5631, v. 1